## NATIONAL LABOR RELATIONS BOARD
### v. BARRETT CO.

#### No. 8226.

Circuit Court of Appeals, Seventh Circuit.
June 2, 1943.

Rehearing Denied June 24, 1943.

Isaiah S. Dorfman, Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Ida Klaus and Fannie M. Boyls, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

960

David R. Clarke and John Harrington, both of Chicago, Ill., and Clarence W. Heyl, of Peoria, Ill., for respondent.

Before KERNER and MINTON, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

Petitioner, National Labor Relations Board, seeks a decree enforcing its order against the respondent, upon charges filed by the International Brotherhood of Firemen and Oilers, a labor organization affiliated with the American Federation of Labor, hereinafter designated as the "Union."

The order is based upon the Board's findings of fact and conclusions that the respondent was guilty of unfair labor practices in violation of § 8 (1), (3), and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158 (1, 3, 5), in that it had interfered with the rights of its employees guaranteed them in § 7 of the Act, 29 U.S. C.A. § 157. The order directs the respondent to cease and desist from the unfair labor practices found and from in any other manner interfering with its employees in the exercise of their rights, including the right to organize and bargain collectively as guaranteed by § 7 of the Act. Further, the order directed that the respondent, upon request, bargain collectively with the Union as the exclusive representative of respondent's employees, and offer to reinstate and make whole certain employees who had been discharged in violation of § 8 (3) and (5) of the Act.

Respondent maintains offices and plants in fourteen states of the Union. This proceeding, however, is concerned only with its plant at Peoria, Illinois, where it is engaged in the manufacture, distribution, and sale of coal tar products. No jurisdictional question is involved, and it is not disputed that the employees involved constituted an appropriate bargaining unit.

The question presented is whether the Board's findings are supported by the evidence.

The Board found that by failing to make any counter-proposals, by unilaterally granting a wage increase in the midst of bargaining negotiations, and by declining to reduce to writing any terms agreed upon, respondent had refused to bargain in good faith. Relative to the strike, the Board found that although the respondent's refusal to accede to the Union's wage demands contributed in some part to the strike, the fundamental cause of the strike and a pervasive factor in its precipitation, as well as its prolongation, was the respondent's unfair labor practices. It also found that while the respondent had invited the strikers to return to work, it had at no time indicated any disposition to bargain in good faith with the Union, and that its invitation to the strikers to return to work amounted to no more than solicitations to abandon the strike.

■ The record discloses that the Board discredited and rejected portions of the testimony of certain of respondent's witnesses. After eliminating such testimony, the established facts are: The Union, in June, 1937, commenced to organize respondent's boiler-room employees and by the early part of August, a majority of the employees had become members. August 24, 1937, one Blake, the Union's business agent, informed respondent's superintendent, Robert W. Morton, of that fact and left with him a proposed contract. Thereafter Morton, Shoffner, respondent's chief engineer, and Blake met on three occasions and discussed the provisions of this contract. At the first conference, on September 8, the Union's wage demand and its proposals for a closed shop and for arbitration were rejected, Morton stating that respondent would not agree to an arbitration clause, nor could it meet the demand for an increase in wages, and as to most of the other proposals, he said they represented "company policy," but that he would consider the matter carefully. The matter was submitted to respondent's legal staff and a draft of counterproposals was prepared. September 23, at the third meeting of the parties, Morton announced a general wage increase and stated that "the raise was not given as the result of the efforts of the union."

In the spring of 1938, negotiations were resumed and four conferences were held. At the first meeting in March, the Union, because of a claim that additional duties had been imposed upon firemen, requested that the wages of the firemen be increased. Morton refused the request and stated that he was "still running his departments and that it was none of * * * [the Union's] business." April 26 the negotiators met again. At this meeting Morton again refused Blake's request for a ten cent increase. Blake thereupon informed Morton

that unless the respondent met the Union's demands "it might be necessary to call a strike." June 21, after the Union had submitted a revised contract without an arbitration clause but containing a closed shop provision and a blank space for the insertion of wage rates, Morton, when asked whether he would sign an agreement if the Union withdrew its demands for wage increases and for a closed shop, replied that "it was against the Company's policy to sign an agreement." At the next conference held on December 1, 1938, Blake demanded a ten cents an hour increase and a signed contract, or, as an alternative, the union scale without a contract, and informed Morton that unless he received an answer within forty-eight hours, he would be obliged to call the men out on strike, to which Morton replied, "I will not stand, not tolerate any outside interference," and that he regretted that respondent "could not meet their terms." December 3, Blake asked Morton if he had reached any decision, to which Morton replied that he was very sorry, but he could not meet their terms. That evening the men went out on a strike and respondent shut down the plant.

On January 14, 1939, Morton informed the union representatives that he intended to reopen the plant and that the strikers might return to their old jobs at their former terms and status. The Union rejected the offer, and respondent, with a new complement of boiler-room employees, resumed operations on January 23. Thereafter, on March 10, 1939, the Union withdrew its wage and contract demands and requested only the reinstatement of the men, but Morton refused the offer, stating he no longer considered them to be employees of respondent. On May 2, the Board's field examiner proposed that the men be reinstated and that negotiations looking toward the signing of an agreement be resumed. Respondent's counsel rejected the suggested settlement, and added that the strikers were no longer respondent's employees, and that under the Act the respondent did not have to sign an agreement.

In support of its contention the respondent argues that the evidence as shown by this record does not have "rational probative force," and that the strike was due to a wage demand only—"a controversy which the Act does not affect to regulate," because, it is said, the question of wages was under discussion at every meeting and no agreement was ever reached on wages or on the terms of any contract.

In reaching our conclusion in this case, we have not overlooked the contention that the Board disregarded what respondent claims to be undisputed and uncontradicted evidence of the actions of the parties, but have given it consideration.

■ The law is well established that it is for the Board to determine the credibility of witnesses, the weight of the evidence and the inferences to be drawn therefrom, and, from all the evidence, to decide whether the respondent was acting in good faith or whether the negotiations were carried on without any intention of reaching a definite agreement or of reducing to writing any agreement that might be reached.

■ The Act obligates the employer to bargain in good faith with the chosen representative of a majority of his employees with respect to all matters which affect his employees as a class, including wages, hours of employment, and working conditions, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, to the end that contracts satisfactory to both employer and employees may be reached, Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126, and these requirements can only be satisfied by an honest and sincere compliance. National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 358, 60 S.Ct. 569, 84 L.Ed. 799. Entering into negotiations for an agreement with a reservation not to reduce it to writing or sign it, is not bargaining in good faith. H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 526, 61 S.Ct. 320, 85 L.Ed. 309; cf. National Labor Relations Board v. Boss Mfg. Co., 7 Cir., 118 F.2d 187; Singer Mfg. Co. v. National Labor Relations Board, 7 Cir., 119 F.2d 131; Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 126 F.2d 452; Aluminum Ore Co. v. National Labor Relations Board, 7 Cir., 131 F.2d 485. Announcing an increase in wages while negotiations are in progress, without prior agreement thereon by a union, is a violation of § 8 (5) of the Act, Great Southern Trucking Co. v. National Labor Relations Board, 4 Cir., 127 F.2d 180, and where the refusal to bargain is

962

one of the causes of a strike, the burden rests' upon the employer, so refusing to bargain, to show that the strike would have taken place even if he had not refused to bargain, National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, and National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167. This the respondent has not done.

The Board also found, upon the statements of Shoffner and Jack Williams, a foreman, that respondent had sought to discourage its employees from joining the Union or from remaining members thereof, and that thereby it had interfered with the rights of its employees in the exercise of rights guaranteed them in § 7 of the Act.

■■ We see no necessity for any extensive discussion of the evidence so far as it relates to this finding, since the statements upon which the Board relied are set out in the decision of the Board, 41 N.L.R.B. 1327, a reading of which discloses that these statements occurred in four conversations between members of the Union and Shoffner and Williams, except to say that we have examined the record, and while it is true that there are inconsistencies and conflicts in the testimony, there was ample evidence to warrant the order, since· a refusal to bargain in violation of § 8 (5) of the Act is likewise a violation of § 8 (1). Pueblo Gas & Fuel Co. v. National Labor Relations Board, 10 Cir., 118 F.2d 304, 307.

■ In the light of these principles, we are of the view that the Board was justified in concluding that the negotiations were not carried on with any intention of reaching a definite agreement or of reducing to writing any agreement that might be reached, so that the respondent failed and refused to bargain in good faith thus violating § 8 (5); that the strikers had ceased to work because of respondent's unfair labor practices; and that by refusing their request for reinstatement on March 13, 1939, respondent discharged them in violation of § 8 (3), and warranted the Board's order to cease and desist from interfering with the rights of its employees in the exercise of rights guaranteed them by § 7 of the Act.

The order is valid. The request for its enforcement is granted.