**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BIRMINGHAM PUBLISHING COMPANY, Respondent.**

**No. 17167.**

United States Court of Appeals
Fifth Circuit.

Dec. 11, 1958.

Rehearing Denied Jan. 20, 1959.

As Amended Feb. 3, 1959.

---

1. The parties will be denominated as in the court below.

Rosanna A. Blake, Atty., N.L.R.B., Washington, D. C., Thomas J. McDermott, Asso. Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Elizabeth W. Weston, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

John H. Doesburg, Jr., Chicago, Ill. (J. Norman Goddess, Chicago, Ill., of counsel), for respondent.

John S. McLellan, Kingsport, Tenn., Amicus Curiae.

Before RIVES, BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This case is before the Court on petition of the National Labor Relations Board for enforcement of its order against the respondent, the Birmingham Publishing Company.[1] The Board

---

1. Pursuant to Section 10(e) of the National Labor Relations Act, as amended. 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

found that: (1) the respondent violated Section 8(a)(1) of the Labor-Management Relations Act by promoting a movement to decertify the Birmingham local union of the International Printing Pressmen and Assistants' Union of North America, AFL-CIO as the bargaining representative of the Company's pressroom employees; (2) the respondent violated Section 8(a)(3) and (1) by discharging employee Howard Edwards because of his union membership and union activity; and, (3) because of these unfair labor practices, the employees went on strike and occupy the status of "unfair labor practice strikers" entitled to reinstatement.[2]

The Board's order directs the Company to cease and desist from the unfair labor practices found, and to reinstate employee Howard Edwards with back pay. The order directs that upon proper application the Company shall offer reinstatement to any of the strikers not already reinstated, the accrual period for back pay to begin on the fifth day after an individual's application and to terminate on the date of the offer of reinstatement.

We grant enforcement of the Board's order in part.

## I.

The Board's story and the Company's story of this case are distinguished by the completeness with which they disagree on all points, major and minor. Under the substantiality test, as stated in Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, the choice between two conflicting lines of testimony and two inconsistent inferences is primarily for the Board. We may displace the Board's choice, but only where "no substantial evidence on the record considered as a whole to support[s] the inference drawn by board". N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567, 568.

The Company's plant is located in Birmingham, Alabama. It produces printed matter by the lithographic process and by the traditional letterpress method. In the spring of 1956 there were nine employees and two foremen in the pressroom, one of three major departments in the plant. Five of these employees, under the supervision of foreman Harold Cleburne, performed the lithographic work or offset press work and allied operations. The others in the pressroom operated the letter presses. They were under the supervision of John Key, later replaced by George Daum. The Union in this case had been recognized as the pressroom bargaining representative for many years. All the employees were members or applicants for membership.

At its monthly meeting in March 1956, the Union acted on the membership applications of four offset employees recently hired by the Company: Johnson and Strasewicz, journeymen, and Wilson and Crutcher, apprentices. Crutcher was blackballed, for some reason not disclosed in the record. The Union's denial of membership to Crutcher was the originating cause of this proceeding. It created a hard choice. Under the Union contract,[3] Crutcher would have to quit his job or the employees would have to affiliate with some other union.

2. The Board's decision and order are reported at 118 NLRB 1380. One member of the Board dissented.

3. The Union contract, a 16-month agreement which was due to expire May 15, 1956, did not require rank-and-file employees to be Union members as a condition of employment, although it did contain such a compulsory membership provision for foremen. However, the contract provided that pressroom work was to be performed only by "journeymen, apprentices and assistants"; and it defined these terms in such a way that it may have been difficult, as a practical matter, for a man or boy to qualify for employment, particularly as an apprentice, unless he was also qualified for Union membership. Among other things, a clause entitled "Apprentice Standards" provided that apprentices failing to meet certain specified "educational requirements" had to "forfeit their positions as apprentice pressmen".

Before working for the Company, Crutcher had been interested in joining the Amalgamated Lithographers of America.[4] He suggested to the other offset employees that they transfer their affiliation to that union. Cleburne, one of the foremen, told the others that he would find out what could be done. He went to James Wyatt, Vice-President of the Company. From then on the Company was hopelessly involved in a situation that was not of its making—however willingly or unwillingly it became entangled in the pro-Union and anti-Union activities of its employees.

Wyatt informed Henley, the President, just what was going on. They talked with their attorney. Wyatt went back to Cleburne, and told him how to go about decertifying the Union. He instructed Cleburne just how to phrase a statement repudiating the Union, and advised him "to keep on bull-dogging until he got his petition in". Cleburne took down Henley's suggestion in longhand. A few days later, Wyatt and Henley met with Cleburne and the offset employees because the men wanted assurance that when the petition for decertification was filed they would not lose their jobs. Henley offered reassurances on this point, stating however that the Company's position was "one of genuine neutrality".

The first petition was signed by Cleburne, Crutcher, Strasewicz, and Johnson, and sent to the Board. A Board agent interviewed Cleburne and, upon ascertaining that Cleburne was a foreman explained that the petition was out of order, since supervisors are ineligible to file petitions in behalf of employees under Section 9(c)(1)(A) of the Act. Cleburne agreed to abide by the agent's instruction that he would not have anything to do with the petition for decertification.

After Cleburne's petition was rejected, Johnson took over. Although Cleburne agreed to have nothing more to do with the petition, on at least one occasion, by his own admission, he attended a meeting with Wyatt and Johnson concerning the petition. Johnson filed the second petition. The only change was in dropping Cleburne's name. This petition was also rejected, because it called for an election in an inappropriate segment of the established bargaining unit—only the offset employees in the pressroom, excluding the letter-press operators in the same department.

Johnson prepared and filed a third decertification petition. This time the document submitted to the Board was signed by Johnson and six other pressroom employees. Those who signed at Johnson's solicitation were Wilson, James Edwards, Bethune (who worked under Cleburne), and Cecile Dover, a deaf mute who worked under George Daum.

In drafting and circulating the new petition and in inducing the employees to sign it, Johnson used company time and facilities, and obtained at least indirect support from company officials. Cleburne knew Johnson was circulating the petition on company time; he aided in typing the petition. Johnson told Wilson, Bethune, Dover, and James Edwards that once the Union was removed, the Company planned to give the employees improved economic benefits such as paid holidays, vacations, sick leave, and a pension plan. Dover was escorted by Johnson into Wyatt's office. Johnson told him that he would be advanced to a journeyman's position if the Union were decertified. Cleburne also came to Dover and said he would have a job as long as he wanted it if he would throw away his Union card.

James Edwards, a younger brother of Howard Edwards, signed the petition under pressure. Young Edwards was eligible for a raise. Instead, he was summoned to President Henley's office

---

4. Before the AFL-CIO merger in December, 1955, the Amalgamated Lithographers was a CIO affiliate. For about forty years it competed with the Union's parent organization; an AFL affiliate, for jurisdiction over offset printers. See Baker, Printers and Technology (Columbia U. Press), pp. 416, 434, 436.

and given two weeks to find another job. The reason for dismissal, Henley stated, was that the Company did not want two members of the same family working in the shop at the same time. Shortly after that, Johnson told young Edwards that his support was needed in the decertification of the Union. Johnson assured him that his job would be secure if he signed the petition and that he would get his overdue pay. Edwards signed. Soon after that, Henley told him that he would not be dismissed after all. Edwards received his pay increase.

Bethune became "confused"; he signed the petition—but wanted to know what was going on. Johnson and Cleburne took him to Wyatt's office. During the course of the discussion, Wyatt said "a good pressman could make his own deal with the employer and do better than by being in the union".

Johnson filed the new petition on June 4. About the end of June, Howard Edwards, the Union's chapel chairman, persuaded Wilson to pay his Union dues. Johnson told Wilson that if Edwards "talked union" any more, he would "get him fired". On July 2, or 3, Johnson escorted Wilson into Henley's office. A discussion between Henley, Wyatt and Cleburne was going on. Wilson testified that they said Edwards was slated for discharge for talking Union. Henley censured Wilson for paying his union dues. Edwards was fired two or three days later.

Howard Edwards remained loyal to the Union. He did not sign the petition. He did not agree with Henley that the Union held good men back. Throughout the preparation and filing of the petitions Edwards openly and actively supported the Union. He continued to serve on the Union's negotiating committee, collected Union dues, and protested violations of Union rules regarding such matters as the manning of presses.

Key had warned Edwards to remain at his presses. Daum, the foreman, a member of the Union for forty-one years, testified that Edwards was discharged for leaving his machine after being repeatedly warned not to leave his presses unattended. Notwithstanding the warnings, Edwards left his presses to "talk union" with the others. Daum told Dover to "watch" Edwards. He told Wilson to let him know the next time Edwards talked to him about the Union. Johnson told Bethune to watch Edwards' activity and report it. At first, the reason Daum gave for firing Edwards was for "spoiling a job". The formal notice of discharge, however, stated that Edwards had been repeatedly warned about leaving his equipment unattended, but had ignored the warnings.

On July 9, after the decertification proceeding, the Union had a meeting. Ewards and International Representative Jurtsen reported to the membership on Edwards' discharge and the Company's position in the decertification proceeding. A motion to strike was carried and became official the next day. There had been some talk of a strike earlier, because the Union suspected that the Company was slowly getting rid of Union members. They decided, however, to wait for the outcome of the decertification proceeding. The Company contends that the discharge of Edwards had nothing to do with the strike; that the reason for the strike was an economic one—Union retaliation when it became apparent that the decertification petition would be processed.

## II.

Section 8(a)(1) of the Act makes it unlawful for an employer to instigate and promote a decertification proceeding or induce employees to sign any other form of union-repudiating document, particularly where the solicitation is strengthened by express or implied threats of reprisal or promises of economic benefit. N. L. R. B. v. Poultry Enterprises, Inc., 5 Cir., 1953, 207 F.2d 522, 524; N. L. R. B. v. Lovvorn, 5 Cir., 1949, 172 F.2d 293, 294. Looking at the record as a whole, we find that there is

substantial evidence to support the Board's finding that the company violated Section 8(a)(1).

There is some proof that the Company officials at times asserted neutrality. Wyatt and Henley however went beyond mere passive observance. They fostered the decertification, furnished advice, and assisted in distributing the decertification petitions.

It is not uncommon for one side or the other to find affirmative help behind a curtain of neutrality. In this case, we agree with the Board that the Company must be held to account for the anti-Union acts of Cleburne and Johnson. Cleburne admittedly was a supervisor although he was required by an agreement with the Union to be a union member. The question therefore is whether he acted in his capacity as supervisor in soliciting the decertification. N. L. R. B. v. Valentine Sugars, 5 Cir., 1954, 211 F.2d 317. If he acted in his official capacity, it was an infringement of the employees' right to freedom of choice in matters of self-organization and collective bargaining. A supervisor may express his personal views and even participate actively, as an individual, in matters such as electing or decertifying a union. Indianapolis Newspapers Inc., 103 N. L. R. B. 1750, reversed on other grounds 7 Cir., 210 F.2d 501. But Cleburne did not merely participate as a union member. To this Court, as to the Board, it appears that with the knowledge of Wyatt and Henley he held himself out to the other employees as working closely with management. This is evidenced by his promises to Dover that Dover would have a job with the Company as long as he wanted, provided he withdrew from the Union.

Johnson was not a supervisor. His actions may, however, be attributed to the Company if Johnson acted in this matter as the Company's agent. International Association of Machinists, etc. v. N. L. R. B., 1940, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50. If an employee, such as Johnson, is clothed with the apparent authority to speak for the employer, it is not necessary to prove that the employer had actual knowledge of the acts committed by the employee; however, the burden is on the Board to show that the employer specifically knew of the employee's acts, and failed to disavow them as reflecting the opinion of the employer. N. L. R. B. v. Mississippi Products, 5 Cir., 1954, 213 F.2d 670. Wyatt knew Johnson was soliciting the employees because Johnson met with Wyatt and Cleburne on at least one occasion. Johnson was "in charge" of the night shift, he was looked up to as a leader, he had his own office, he told the others he had the power to hire and fire. Johnson was the moving spirit in the decertification endeavor. He circulated the petitions, requested employees to sign, and promised salary raises and other benefits to various employees often in the presence of supervisors. In a shop as small as respondent's with Johnson given free rein, there is not much doubt as to the Company's knowledge of his activities. Its failure to deny Johnson's authority to promise salary raises and other benefits lends support to the inference that Johnson was clothed with authority to speak for the Company.

### III.

This Court has held that "the burden is on the Board to prove and not on the employer to disprove the presence of anti-union animus or other prohibited discriminatory motivations in hiring and firing".[5] We cannot say that the Board has met the burden of proof that Edwards' discharge was "discriminatorily motivated" or that the Board's finding of unlawful motivation is supported by substantial evidence. On this phase of the case we are in

5. N. L. R. B. v. Brady Aviation Corp., 5 Cir., 1955, 224 F.2d 23, 25. See also N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 1941, 122 F.2d 433; N. L. R. B. v. Fulton Bag & Cotton Mills, 5 Cir., 1949, 175 F.2d 675; N. L. R. B. v. Ray Smith Transport Co., 5 Cir., 1951, 193 F.2d 142; N. L. R. B. v. Denton, 5 Cir., 1954, 217 F.2d 567.

agreement with Member Jenkins, dissenting member of the Board. 118 N. L. R. B. 1380, 1388.

██ If a man has given his employer just cause for his discharge, the Board cannot save him from the consequences by showing that he was pro-union and his employer anti-union. We have no doubt that the Birmingham Publishing Company was glad to get rid of Edwards. But the Company has a right to operate its plant efficiently. If an employee is both inefficient and engaged in union activities, that is a co-incidence that does not destroy the just cause for his discharge. We cannot say, and the evidence does not support the conclusion that the Board can say: Edwards was fired because the Company's officials had an anti-union animus against Edwards.

The evidence shows beyond a doubt that Edwards left his presses during working hours. Daum had been hired as Supervisor of the letterpress department a short time before this case came to a head. He was given a free hand in running his department. He had been a member of the Union for forty-one years. Daum testified that he discharged Edwards because Edwards persisted in leaving his presses and because he had spoiled a printing job. Edwards has never denied that he left his presses. He did deny receiving warnings. Daum contradicted this, and is supported by the testimony of Key and Jurtsen.

In part, the Board based its holding that the Company discriminated against Edwards on the fact that Johnson, leader of the anti-union faction, was allowed freedom to roam the plant night and day; as against the Company discharging Edwards for leaving his presses. But Johnson was not under Daum's supervision; what Johnson or other employees did had no relation to Daum's rules—reasonable rules, they seem— that expensive, high-speed presses could not be left unattended during working hours.

In part, the Board based its holding on its reluctance to disturb the Trial Examiner's findings that Edwards' version of the facts, not Daum's version, should be credited. We share the Board's reluctance to disturb findings— in general. So did Member Jenkins. But we agree with the dissenting member: "Daum did warn Edwards [who denied it] and did discharge him because Edwards disobeyed his orders, continued to leave his press unattended. * * * Daum is a far more credible witness than Edwards". 118 N.L.R.B. 1380, 1391. There is conflicting evidence as to Daum's attitude toward the union, but at the time of the hearing he was no longer working for the respondent. He was the one person who participated in the discharge who had little or no reason to be interested in the outcome of the proceedings. The Board's order of reinstatement and its back pay award to Edwards is unjustified and may not be enforced.

### IV.

We agree with the Board's holding in regard to the strike of July 10, 1956. The strike was based, at least in part, on the Company's unfair labor practices; we cannot say that it was based only on economic reasons. The evidence in support of the Board's finding is that the reason for the strike was the Company's participation in the certification proceedings (which we hold to be an unfair labor practice) and the Edwards discharge (which we hold was not an unfair labor practice). The Company contends that the cause of the strike was the Union's failure to obtain a contract, and that the strike was purely a tactical maneuver.

██ Again, we need not find only one motivating reason. If there was a causal connection between the unfair labor practices and the strike, the striking employees are entitled to re-

instatement.[6] On the record, the practice we find to have been unfair labor practices were a contributing cause of the strike. The striking employees, excluding Howard Edwards, must be offered reinstatement in accordance with the order of the Board.

The Board's order will be modified in accordance with this opinion. As modified, the order is hereby

Enforced.

---

6. N. L. R. B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 872, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L. Ed. 1540; N. L. R. B. v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, 175–176, certiorari denied 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506; N. L. R. B. v. Barrett Co., 7 Cir., 135 F.2d 959, 962; Berkshire Knitting Mills v. N. L. R. B., 3 Cir., 139 F.2d 134, certiorari denied 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579; N. L. R. B. v. A. Sartorius & Co., 2 Cir., 140 F.2d 203; N. L. R. B. v. Stilley Plywood Company, Inc., 4 Cir., 199 F.2d 319, certiorari denied 344 U.S. 933, 73 S.Ct. 504, 97 L.Ed. 718; N. L. R. B. v. West Coast Casket Co., 9 Cir., 205 F.2d 902, 907.