**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MATERIALS TRANSPORTATION COMPANY, and Cement Trucking Company, Respondents.**

No. 26862.

United States Court of Appeals
Fifth Circuit.

July 7, 1969.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Nancy M. Sherman, Mitchell L. Strickler, Attys., N.L.R.B., Washington, D.C., Clifford Potter, Director, Region 23, N.L.R.B., Houston, Tex., for petitioner.

L. G. Clinton, Jr., Fulbright, Crooker, Freeman, Bates, & Jaworski, Kenneth R. Carr, Houston, Tex., Scott Toothaker, Ewers, Toothaker, Ewers, Abbott & Evins, McAllen, Tex., for respondents.

Before WISDOM and DYER, Circuit Judges, and KRENTZMAN, District Judge.

DYER, Circuit Judge:

This case is before us upon the petition of the National Labor Relations Board for enforcement of its order.[1] The Board found that the Company had violated Section 8(a) (1) and 8(a) (3) and (1) of the Act.

The Company is a *trucking firm* which hauls bulk and sack cement for its sole customer, Centex Cement Corporation.[2] In early 1966 the Company's volume of business began to decrease. This decrease was precipitated by three factors: a business slow-down in the cement industry, Centex's utilization of an alternative method of transporting cement, and the completion of a dam project which used 50,000 barrels of bulk cement in 1965.

In late May or early June the Union began an organizational campaign among the Company's drivers.[3] On June 10, 1966, Bomer, a driver and union activist, was laid off. On June 21, 1966, five other employees were laid off.[4] The Company urges that these layoffs together with others effected before June 21, 1966, were necessitated by the decrease in the volume of the Company's business and that they were given to the employees with the worst work records.[5] The Board contends that the five were discriminatorily laid off in violation of 8(a) (3) and (1) of the Act.

The Company does not contest, and the record fully supports the Board's determination that the Company violated 8(a) (1) of the Act by interrogating and threatening three employee drivers, Bazan, Shipp and Bomer. All of the interrogations took place, however, after the last of the layoffs had been made, i.e., Bazan's one week later, Bomer's three weeks later, and Shipp's one month later. Of the three, Bomer was the only one laid off. Against this background we proceed to the 8(a) (3) violations found by the Board contrary to the findings of the Trial Examiner.

■ The threshold question is whether there is substantial evidence in the record to support the Board's contention that the layoffs were discriminatory in nature and not motivated by economic necessity. Universal Camera Corp. v.

---

1. 170 N.L.R.B. No. 102, issued April 2, 1968.

2. The respondent is actually two separate companies, Materials Trucking Company and Cement Trucking Company, which have the same officers and supervisory personnel and pursue a common labor policy. Both companies admit that they constitute a single-integrated enterprise and were found by the Trial Examiner to constitute a single-integrated employer.

3. General Drivers and Helpers, Local No. 657, Affiliated with Inernational Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

4. The five laid off were Boykin, Kerley, Pena, Marshall and Harding. The Union charged that the terminations of Bomer,

Boykin, Kerley, Pena and Marshall violated 8(a) (3) and (1) of the Act. No charge of discrimination was made concerning the layoff of Harding.

5. It is undisputed that the N. L. R. B. in 1961 had advised the Company to keep records on the performance of its employees. The Company maintained a file on each driver. Each time a driver was involved in a driving mishap a notation was made in the driver's file. The careless and/or destructive operation of a truck would fall into this category. Notations were also made in a driver's file whenever customers or management complained about his conduct. Insubordination, lateness, profanity and breaches of company rules would fall into this category.

N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The evidence will support no other finding than that the layoffs were because of economic conditions. The General Counsel conceded this at the hearing.[6] The Board's attempt to circumvent this admission miss the point. It is true that originally the General Counsel proceeded on the theory that the layoffs were discriminatory by their very nature. However, after all of the evidence concerning the layoffs had been received, the General Counsel candidly admitted that they were made for economic reasons. We agree with the Board, however, that the General Counsel did not concede that there was no discrimination in the timing of the layoffs or the choice of the drivers to be laid off, but these are different questions and will be dealt with later. The evidence indicating that the layoffs were economic in nature was overwhelming. All of the witnesses agreed that business was not good during the time preceding the layoffs.[7] The Company guaranteed the drivers forty hours of work each week, but business had become so slow that many of the drivers were not getting their forty hours of work. The Company, however, paid the men for forty hours regardless of how many hours they actually worked.

It was uncontroverted that the cement business had been slow, that a dam project which Centex had furnished with 50,000 barrels of cement in 1965 required only 5,000 barrels in 1966, and that Centex was using an alternative method to transport its cement.[8] These three factors decreased the Company's volume of business by about fifteen percent.

■ The Board contends that all of the economic conditions which led to the decrease in the Company's business were present in January, 1966, and that any economic layoff would have had to occur in January and not in June. There is no evidentiary basis to support the Board's position that the Company's decrease in business was final, irreversible and predictable in January, 1966. There is evidence, however, that other employees had quit or been discharged prior to June. General Electric Co. v. N.L.R.B., 5 Cir. 1968, 400 F.2d 713, relied on by the Board, is inapposite. There the Company had for seven months failed to meet the urgent demands of employees for a wage increase and then suddenly granted a unilateral wage increase after the union had won the election and one day before the union was certified. Given the economic necessity which existed in the case *sub*

---

6. Just prior to the appearance of the last witness, the Trial Examiner and the General Counsel had the following dialogue:
   *Trial Examiner:* If I understand you correctly you concede that the lay-off was an economic lay-off.
   *Mr. Bickerton:* I concede that there is no evidence to show the contrary.

7. The following testimony was given by witnesses for the petitioner:
   *Williams:* (assistant manager—union adherent) Well business was off and slow, and everybody knew that we had too many men on the job.
   * * * * *
   *Question:* In June of 1966, had business been pretty good out there at the company?
   *Pena:* (laid off driver) It was pretty slow at that time.
   * * * * *

*Question:* Business, as far as you know then, was pretty good in June of 1966?
*Bomer:* (union activist—laid off driver) Business wasn't exactly what I would call good at that time, no sir.
*Question:* You knew the compay was having problems, and you understood their problems?
*Bomer:* At that time, yes sir.

8. A new barge terminal was completed in Beaumont, Texas, in the latter part of 1965. Centex began to make all of its shipments of bulk cement to Beaumont by barge. The Company still trucked sack cement into Beaumont for Centex, but sack cement represented only a small percent of Centex's business in the Beaumont area.

*judice,* it was management's function to decide at what point the slowdown became sufficiently protracted to require a decrease in personnel. Management decisions are not subject to the second-guessing of the Board or the Courts unless it is shown by substantial evidence in the record as a whole that the decisions violate the Act. N.L.R.B. v. McGahey, 5 Cir. 1956, 233 F.2d 406. Satisfied that all of the evidence in the record shows that the layoffs were motivated by economic necessity, we proceed to examine the Board's contention that the Company discriminatorily chose the drivers to be laid off on the basis of their union activity.

■ The Board alternatively contends that even if the layoffs were economically justified, the Company discriminatorily chose the five drivers to be laid off solely on the basis of their union activity. The Board seems to take the position that once the Company is shown by substantial evidence to harbor anti-union animus, any layoffs thereafter violate 8(a) (3) of the Act. However, this blanket approach does not relieve the Board of its burden of proving illegal motives in the discharge. We have on many occasions granted enforcement of the Board's order concerning 8(a) (1) violations while at the same time denying enforcement as to alleged 8(a) (3) violations. N.L.R.B. v. Camco, Inc., 5 Cir. 1965, 340 F.2d 803, cert. denied 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339; N.L.R.B. v. Atlanta Coca-Cola Bottling Co., 5 Cir. 1961, 293 F.2d 300; N.L.R.B. v. McGahey, *supra.* An employer's general hostility to unions, without more, does not supply an unlawful motive as to discharges, N.L.R.B. v. Monroe Auto Equip. Co., 8 Cir. 1966, 368 F.2d 975; N.L.R.B. v. Little Rock Downtowner, Inc., 8 Cir. 1965, 341 F.2d 1020; N.L.R.B. v. Mt. Vernon Telephone Corp., 6 Cir. 1965, 352 F.2d 977; Beaver Valley Canning Co. v. N.L.R.B., 8 Cir. 1964, 332 F.2d 429. Business judgment cannot be condemned merely because it coincides with anti-union sentiment. N.L.R.B. v. Birmingham Publishing Co., 5 Cir. 1959, 262 F.2d 2.

■■ The Board has the burden of showing: (1) that the Company had knowledge of the employees' union activity; and (2) that the employees were discriminatorily chosen to be laid off because of their union activity. N.L.R.B. v. Whitfield Pickle Co., 5 Cir. 1967, 374 F.2d 576. To show discrimination the Board must prove that the employee would have been treated differently in the absence of union activity. Frosty Morn Meats, Inc. v. N.L.R.B., 5 Cir. 1961, 296 F.2d 617.

The Board's contention that the five drivers were the victims of a blanket discharge for their union activity is not supported by substantial evidence in the record.

There was no evidence that the Company had knowledge of any union activity on the part of Marshall and Harding, two of the employees who were laid off on June 21. The Board tacitly admits that the Company had no knowledge of Marshall's union activity. The Board makes no explanation as to why Harding was not included in its order.

Harrison and Flores were known to be attending the union meetings, yet neither of these drivers was laid off. Shipp and Bazan, whose separate interrogations by Newkirk constituted the basis for the Board's findings of violations of 8(a) (1), were not laid off either.

■■ A majority of the Company's employees were known by management to be attending the union meetings. Over eighty percent of the Company's employees were union adherents.[9]

9. The Trial Examiner determined that a letter written by Halpenny, the professional union organizer, to the Company named nineteen employees as union adherents excluding the name of Supervisor Williams. The list did not contain the names of Bomer, Pena, Kerley, Marshall or Boykin. Prior to the layoffs the Company had approximately thirty employees. Therefore approximately eighty percent of the employees were union adherents.

Where such a great percentage of employees attend union meetings and are union adherents, Company knowledge of the identity of the union adherents loses much of its significance without a showing that the employees not in favor of the union were more logical candidates for layoffs, N.L.R.B. v. River Togs, Inc., 2 Cir. 1967, 382 F.2d 198, a showing that was not made here. We reject the Board's contention that the Company made a discriminatory blanket discharge of union adherents and proceed to consider the layoffs individually.

■ The Board, contrary to the Trial Examiner's finding, determined that Bomer, Kerley, Boykin, Pena and Marshall were laid off because of their union activities. The Trial Examiner's findings are to be reviewed as a part of the record, and must be considered by us in assessing the substantiality of the evidence supporting the Board's decision. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456; Dobbs Houses, Inc. v. N. L. R. B., 5 Cir. 1963, 325 F.2d 531, 537. Where the Board and the Trial Examiner reach different conclusions, if the Board's conclusions are supported by substantial evidence in the record considered as a whole, we must grant enforcement. N. L. R. B. v. Miami Coca-Cola Bottling Co., 5 Cir. 1967, 382 F.2d 921, 923; N.L.R.B. v. Camco, Inc., *supra*. Using these standards we assay the evidence.

As we have pointed out, the Company insists that the layoffs were precipitated by a business slowdown and we find no evidence in the record to the contrary. We also find that there is no substantial evidence in the record to support the Board's conclusion that the layoffs constituted a blanket discharge of union adherents. Now we must determine the Company's motive in each individual discharge. N. L. R. B. v. Great Dane Trailers, Inc., 5 Cir. 1966, 363 F.2d 130.

■ Bomer was the first man to contact the union and signed the first union card. Bomer was laid off on June 10, 1966, the day upon which he held the first meeting at his house. There is substantial evidence in the record that the Company had knowledge of his union activity. Manager Newkirk had talked with assistant manager Williams about Bomer's union activity and knew about the meeting at Bomer's house. After Bomer was laid off Newkirk asked him why the employees wanted a union. The drivers laid off on June 21, 1966, had poor performance records, but Bomer had a good record as evidenced by Newkirk's offer to give him a reference. Also, there were employees with less seniority than Bomer at the time he was laid off. The Trial Examiner found that the five drivers were fired under similar circumstances. This finding was erroneous as to Bomer. Bomer represented the one instance where the Company strayed from its policy of laying off the drivers with the worst work records. He was laid off almost two weeks before the other four drivers. He was also the most ardent union supporter of all. Even though Bomer did acknowledge that business had not been good, we find that there is substantial evidence in the record considered as a whole to support the Board's conclusion that he was selected to be laid off because of his union activity. N. L. R. B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, on remand, 5 Cir. 1963, 311 F.2d 541, and 322 F.2d 187.

■ Assistant Manager Williams knew that Pena was attending union meetings. This knowledge, however, loses its significance because a majority of the employees were attending the meetings and, according to Williams, Newkirk knew their identity. N. L. R. B. v. River Togs, Inc., *supra*. In any event, the Board has the burden of proving the element of illegal purpose in making the layoffs. N. L. R. B. v. Miami Coca-Cola Bottling Co., *supra*. Newkirk told Pena that he was going to be laid off because work was slow and he had a bad accident record. Pena acknowledged that his record was bad and that he had been

**1080**

expecting to be laid off because he had less seniority than most of the drivers. Pena, like the other witnesses, testified that work was slow at that time. The Company was paying him for forty hours per week but he wasn't getting that much work. We find no substantial evidence in the record to support the Board's determination that Pena was laid off discriminatorily because of his union activity. The record clearly shows that Pena was laid off because of business conditions and his bad accident record.

■ There is no evidence in the record and the Board tacitly admits that the Company had no knowledge of Marshall's union activity. Marshall never engaged in union activity on Company property and the Company had no knowledge of his involvement. Marshall was one of the three identified by Williams as having the worst work records among the drivers. Marshall had been discharged once before for ruining a tire. Swaney, a witness for the Board and a good friend of one of the laid off drivers, in his capacity as shipping foreman, had to report customers' complaints about Marshall to Newkirk. Marshall admitted that he knew the people at Centex were complaining about his work and that Newkirk had warned him about it several times. The evidence is uncontradicted that Marshall was so slow in making his deliveries that he was never assigned a rush order. He even refused to haul a load on one occasion and was given a three-day suspension. We find that there is no substantial evidence in the record that the Company knew of Marshall's union activity or that the Company discriminatorily discharged him for such activity.

■ Although the Company knew of Boykin's union activity there is no evidence that the Company purposely fired Boykin because of this. Boykin was another of the three drivers with the worst performance records. Boykin had a long record of destruction of Company property. On one occasion Boykin had broken the bell housing on a diesel engine. On other occasions he had overheated a truck and had driven on a flat tire until it was ruined. He was laid off three days for ruining the tire. On yet another occasion Boykin had mounted his truck while intoxicated and had driven over a fire plug. We find the evidence to be overwhelming that Boykin was selected to be laid off because of history of destruction of Company property and not because of his union activity.

■ There is substantial but conflicting evidence that the Company knew of Kerley's union activity. We recognize that under *Universal Camera* the Board's credibility choices must stand, and we therefore accept the Board's determination that the Company did in fact have knowledge of Kerley's union involvement. Kerley was the third of the three drivers whom Williams described as having the worst performance records. Kerley's record showed him to be an ill-humored troublemaker. He had arguments with several people including customers. He had threatened another driver and had on one occasion threatened to cut off a man's ears "and stick them —— —— ——." He did not deny calling management "a bunch of two-bit SOB's." His excuse was that management gave him what he felt to be an illegal order. Kerley had embarrassed Sanderson, sales manager for Centex, in front of a customer, and also stated that certain of Centex's products weren't selling too well because Centex was not doing a very good selling job. Again the evidence is overwhelming that when the Company found itself faced with the necessity of cutting back its manpower, it selected Kerley to be laid off because of his profane troublemaking with his co-employees, customers and management.

Boykin, Pena, Kerley and Marshall were all given the opportunity to discuss their records with the president of the Company. None of the drivers questioned the correctness of their records. Also, we think that it is of some significance that at the time of trial, six months after the layoffs in question, the

Company had hired no additional employees to fill the vacancies. Cf. N.L.R.B. v. A. R. Gieringer Tool Corp., 7 Cir. 1963, 314 F.2d 359, 361; N.L.R.B. v. Atlanta Coca-Cola Bottling Co., 5 Cir.1961, 293 F.2d 300, 307.

The Board's order concerning the 8(a)(1) violations is enforced. The Board's order concerning the 8(a)(3) violations is enforced as to Roy Bomer only. Enforcement as to Santiago Pena, Johnny Boykin, Arthur Marshall and Carl Kerley is denied.

Enforced in part; denied in part.