**HELENA LABORATORIES CORPORA-TION, Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 76–3077.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1977.

**1184**

George E. Duncan, Beaumont, Tex., for petitioner-cross respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, John S. Irving, Gen. Counsel, Marion Griffin, Atty., Alan Banov, N.L.R.B., Washington, D. C., for respondent-cross petitioner.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

This matter is before us on the petition of Helena Laboratories Corporation to review and set aside an order of the National Labor Relations Board issued on June 26, 1976, and the cross-petition of the Board for enforcement. The Board held that the company violated Section 8(a)(1) of the National Labor Relations Act (29 U.S.C. § 151, *et seq.*) by coercively interrogating employees, promising benefits, threatening reprisals, forming an in-plant grievance committee to dissuade employees from supporting the Union and by interfering with employee witnesses and the Union's presentation of its case at a post-election hearing. The Board further found that the company violated Sections 8(a)(1) and (3) of the Act by discriminatorily denying wage increases to five employees and discharging employees Michael Coody, Lois Acker and Carol Dennis.

The company operates a factory in Beaumont, Texas, where it manufactures and repairs densitometers and other machines designed to assist in the laboratory analysis of body protein content. On November 14, 1974, pursuant to a petition of the Communications Workers of America, AFL–CIO, the Board conducted a representation election, resulting in 40 votes for the Union, 39 against it, and 9 challenged ballots. Upon the Union's objections alleging pre-election misconduct, a hearing was held on January 13–15, 1975. A recount of the votes showed 40 votes for the Union and 43 against it. The election was set aside and a second election on September 11, 1975 resulted in 48 votes for the Union, 46 against, and 8 challenged ballots. On October 14, 1976 the Union was certified as bargaining representative.

The unfair labor practice charges grow out of incidents occurring during the pre-election campaign, the January 1975 post-election representation hearing, and the subsequent discharge in February 1975 of three Union supporters, Coody, Acker and Dennis.

■ Without reweighing the evidence or making credibility choices,[1] we find substantial evidence to support the following incidents upon which the Board could have reasonably relied in concluding that the company was in violation of the Act.

### Pre-election Incidents

The campaign for Union representation was initiated by Michael Coody. On October 1, 1974, he signed a Union authorization card from other employees. Eight days later Ovay Mayes, Vice President of the company, called Coody into his office and questioned him at length about these activities as well as difficulties Coody was having with his supervisor, Greg Thames.[2] Ralph Whitney, Production Manager, Ann Golias, Secretary-Treasurer and wife of President Tipton Golias, and Supervisor Thames later joined the group and continued to interrogate Coody along the same lines. Ann Golias informed Coody that a clause in the company's profit-sharing plan excluded Union members. The meeting lasted well beyond four hours. Several days later at an informal party given by an employee for the purpose of discussing Union membership benefits, Ann Golias, in response to criticism about the company's wage rates, volunteered the remark that "It is quite possible that certain employees have been overlooked in their evaluations and raises and we will take care of that immediately."

In the early part of September 1974 the company employed Betty Carter as a "lead person trainee." Employees were told that she would ultimately have authority to fire if the work was not done to her satisfaction.[3] Approximately two months later Carol Dennis was questioned by Betty Carter relative to a Union button she was wearing and pro-Union literature which she was reading. Dennis was an active Union supporter. She had signed a Union card, wore her Union button daily, and had distributed buttons to several employees. During the discussion between Carter and Dennis, Carter denounced Union organization and spoke of its alleged inevitable effects—strikes, replacement of workers and loss of hospitalization benefits. On another occasion Carter told Dennis that if the Union was voted in everyone could be fired. This admonition was again repeated by Carter in the presence of Dennis two days before the election. At a pre-election meeting shortly thereafter, Carter informed President Golias that some of the girls had said they could not be fired for joining a union, to which he replied that he could fire anyone at any time. On the day of the election Carter asked Dennis if anything she had said regarding the Union had "sunk in." Dennis replied that it had but that she intended to vote for the Union regardless.

Lois Acker was another Union activist. She had signed a Union card and distributed several of them as well as pro-Union leaflets to employees. Acker was one of the three witnesses who testified for the Union at the representation hearing.

During the last week of the campaign Supervisors Thames and Sims attended a union-sponsored organizational meeting. The assembled employees were told by Sims that if the Union was voted in the company would contract out a large portion of its work and gradually phase out certain employees.

### Post-election Incidents

Following a suggestion previously made by Ann Golias and urged by Coody, President Golias approved the formation of an in-plant grievance committee approximate-

---

1. This is neither our function nor our privilege in the absence of unreasonable or self-contradictory findings. See *N. L. R. B. v. Walton Manufacturing Co.*, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829.

2. Thames had previously enjoyed a good working relationship with Coody and had recommended in July of 1974 that Coody be given a wage increase. There is evidence that Coody's subsequent Union activities precipitated several arguments between the two men. Coody was transferred to another department and subsequently discharged.

3. The evidence is in conflict regarding whether this statement was made. The Administrative Law Judge chose to believe that it was.

ly a week after the election. The company elected Jim Herod as Chairman and Coody and three others as representatives of departments. The committee was allowed to use company time to process grievances but its functions were limited as it was prohibited from discussing wages, salaries, holidays, sick leave benefits, profit sharing or insurance. As already indicated, the initial election precipitated a representation hearing held on January 13–15, 1975. Three days prior thereto President Golias asked Coody to drop all but one challenge and one objection. A discussion later ensued among President Golias, Coody and Herod relative to payment of these two employees during their attendance at the forthcoming hearing. Golias asked if the Union was going to pay for the time, to which Coody replied that he did not expect to be paid twice. Golias responded that if the employees kept their testimony "short and sweet" the company could afford to pay them for two or three hours as well as mileage. The subject was again brought up by Golias on the third day of the hearing when he told Coody, Herod and Acker, after they had testified at length to unfair practices of the company, that "If you had done it like I asked you to . . . I would have paid you for it. All I wanted you to do was come up here and make it short and sweet, just make your statement and go back to work."

Upon Coody's return to the plant on the final day of the hearing, after securing permission from his foreman, he went to another office to obtain the telephone number of a fellow employee recently dis-

charged to determine whether a grievance complaint should be processed. There he met President Golias but the two men did not speak. When Coody returned to his work station he was given a written reprimand by Production Manager Whitney for using company time for personal business. When Coody pressed Whitney for an explanation, he was told that the reprimand was given under instructions of President Golias. The written reprimand was the first ever received by Coody. It contained the notation, "Will not reflect on performance review if corrective action is taken by the employee."

Shortly after the representation hearing, wage increases were given to all but five of the company's 80 to 100 employees. Among the five were Coody, Acker and Dennis.[4] Unsatisfactory job attitude was cited as a factor in denying all three wage increases. They were admonished to change their attitude or they would be discharged. Coody, Acker and Dennis were fired the following month. Coody and Acker were two of the three employees who testified for the Union at the representation hearing.

### The Issues

The company makes the following contentions in its petition for review:

1. Substantial evidence fails to support the finding that the discharges of Coody, Acker and Dennis were in violation of Sections 8(a)(1) and (3) of the Act.

2. The Board erred in finding that while Betty Carter, a lead lady, was not a supervisor, the company nevertheless was respon-

---

**4.** Herod and Peggy Duplissey, whom he subsequently married, are the two additional employees who were denied wage increases in January 1975. At the time of the unfair labor practice hearing the Herods were in California where James Herod is employed by the company. They disclaimed any interest in participating in the hearing despite a complaint filed by the Board alleging, *inter alia,* unfair labor practices by the company in discriminatorily denying their wage increases. The company does not assert as an issue the Board's finding that the denial of wage increases to these five employees was violative of the Act. However, in its argument regarding the alleged bias of the hearing officer, the company contends that

there is insufficient evidence to support a backpay award to the Herods. We need not belabor the point in regard to Herod. The company's antipathy toward Union organization and its awareness of Herod's active Union support, evidenced by his chairmanship of the grievance committee and his testimony at the representation hearing, give ample foundation for the Board's conclusion that he was discriminatorily denied a pay raise. However, we find no evidence of Union activity of Peggy Duplissey Herod to support the Board's finding of discrimination in respect to her. Consequently that part of the order requiring that Duplissey be made whole for any loss of pay is vacated and set aside.

sible for her statements on an agency theory.

3. That the bias and prejudice of the Administrative Law Judge caused the denial of administrative due process to the company.

## I.

The company contends that contrary to the Board's findings, the record shows that the discharges of Coody, Acker and Dennis were for cause. The Board inferred from the testimony that the alleged "causes" were pretexts.

■ While it has long been established that management is at liberty to discharge for good cause, bad cause, or no cause at all, there is one specific limitation on that privilege—it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids. See *N. L. R. B. v. McGahey*, 5 Cir., 1956, 233 F.2d 406; *N. L. R. B. v. Borden Company*, 5 Cir., 1968, 392 F.2d 412; *Boaz Spinning Company v. N. L. R. B.*, 5 Cir., 1968, 395 F.2d 512; *N. L. R. B. v. Materials Transportation Company*, 5 Cir., 1969, 412 F.2d 1074; *N. L. R. B. v. Shepherd Laundries Co.*, 5 Cir., 1971, 440 F.2d 856. Several factors were cited as reasons for terminating the employment of the dischargees. However, the evidence relied on by the company to support these reasons was conflicting and almost completely contradictory to the evidence of the Board. The choice between two conflicting lines of testimony and two inconsistent inferences is primarily a Board function, *N. L. R. B. v. Coats & Clark, Inc.*, 5 Cir., 1956, 231 F.2d 567; *N. L. R. B. v. Birmingham Publishing Company*, 5 Cir., 1959, 262 F.2d 2, and it is not our function to pass on the credibility of witnesses or reweigh the evidence. We must enforce the findings of the Board if the record taken as a whole shows substantial evidence to support those findings. *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *N. L. R. B. v. Walton Manufacturing Co.*, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). Applying this test, we find that there was substantial evidence to show that the company's primary motivation for the discharges was the pro-Union sentiments and activities of the three employees involved.

## II.

■ The Administrative Law Judge found that Betty Carter was a supervisor within the meaning of the Act and that the company was responsible for her coercive statements made prior to the election. The Board disagreed with the characterization of Carter as a supervisor at the time in question but adopted the findings that Carter's pre-election coercive statements were attributable to the company. We give little pause to the company's contention that the Board erred in this conclusion. The Board found that the company placed Carter in a position where employees could reasonably believe that she spoke on behalf of management during her tenure as lead person trainee. Substantial evidence, discussed *infra*, and the testimony of Carter herself support this determination. At the unfair labor practices hearing, despite her repeated protests that "she was never in charge of anything," she was impeached with her affidavit in which she said, "I took over gradually. I was in charge at the time we moved to the new building." The move occurred about the first week of November 1974, prior to the election and two months after Carter was hired and introduced as a person with authority to see that all work assignments were carried out to her satisfaction.

■ As the Board points out in its brief, an employer can be held liable for unfair labor practices committed by a person acting as its agent regardless of the fact that the agent has not been designated as a supervisor. See *N. L. R. B. v. Aclang, Inc.*, 5 Cir., 1972, 466 F.2d 558; *N. L. R. B. v. City Transportation Company*, 5 Cir., 1962, 303 F.2d 299; *N. L. R. B. v. Birmingham Publishing Company*, 5 Cir., 1959, 262 F.2d 2.

### III.

Finally, we consider the company's contention that the interaction of intemperate language in the Board's brief, submitted in connection with the representation hearing, and bias and prejudice of the Administrative Law Judge so infected the proceedings as to cause denial of administrative due process to the company.

■ Following the unfair labor practice hearing, Board counsel in his brief characterized the company as being "nothing more than a crude run-of-the-mill law violator," "guilty of the gravest improprieties," capable of only "gawkish efforts" and ranking "with the more sophisticated of strategists—truly having no peers in the art of achieving a complete botchery of execution." He further criticized the presentation of the company's defense as "absolutely false." Such disparaging and distasteful language was both improper and unwarranted. Nevertheless, logic and fairness compel us to disagree with the contention that as a result of these critical remarks the Administrative Law Judge abandoned his role as a disinterested fact finder.

■ The company cites several instances to support its claim of prejudice of the Administrative Law Judge. The allegations are directed in most part to credibility determinations [5] and alleged irregularities in rulings relative to the reception of evidence. As we noted in *Sardis Luggage Co. v. N. L. R. B.*, 5 Cir., 1956, 234 F.2d 190, 192, the Act requires that rules of evidence be adhered to in Board proceedings only "so far as practicable."

■ The necessity for impartiality of the fact finder to assure a fair trial in an administrative proceeding was discussed in *N. L. R. B. v. Phelps*, 5 Cir., 1943, 136 F.2d 562, 563–64:

[A] fair trial by an unbiased and non-partisan trier of the facts is of the essence of the adjudicatory process as well when the judging is done in an administrative proceeding by an administrative functionary as when it is done in a court by a judge. Indeed, if there is any difference, the rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the safeguards which have been thrown around court proceedings have, in the interest of expedition and a supposed administrative efficiency been relaxed. Nor will the fact that an examination of the record shows that there was evidence which would support the judgment, at all save a trial from the charge of unfairness, for when the fault of bias and prejudice in a judge first rears its ugly head, its effect remains throughout the whole proceeding. Once partiality appears, and particularly when, though challenged, it is unrelieved against, it taints and vitiates all of the proceedings, and no judgment based upon them may stand.

Our careful examination of the record fails to show that the company was deprived of its fundamental right to a fair trial. Indicative of lack of partiality on the part of the hearing officer is his dismissal of several violations alleged by the Union. Additionally, as the transcript shows, objections of company counsel as well as Board counsel were sustained or overruled with an even hand. In certain instances the Administrative Law Judge exhibited patience during repetitious and apparently insignificant testimony of witnesses for both sides. His conduct does not indicate discourtesy to either company counsel or its witnesses. In short, we cannot conclude that "the pro-

---

**5.** For example, in his decision the Administrative Law Judge describes the reason for Coody's discharge as "overblown, contrived and bordering on the absurd. The manner in which Coody checked out the tools [an event which, according to Production Manager Whitney, triggered Coody's discharge] is as near to a non-event as words could describe." In another instance the Administrative Law Judge said that Whitney's testimony was "incredible and that the giving of such testimony under oath in a Board proceeding warrants further investigation." While we do not condone these excessive remarks in impugning the credibility of a witness, we are not convinced that they demonstrate the prejudice attributed to them by the company.

ceedings were characterized by fell expedition or determined purpose to reach a predetermined end, or were attended with suppressive and exclusionary rulings and actions, designed to prevent and preventing a fair hearing." *See Continental Box Co. v. ´N. L. R. B.*, 5 Cir., 1940, 113 F.2d 93, 96.

Accordingly, the order will be enforced with the exception of that part thereof directing that Peggy Duplissey be made whole for loss of pay.[6]