NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

J. M. WOOD MANUFACTURING COM-
PANY, Inc., Respondent.

No. 71–2677.

United States Court of Appeals,
Fifth Circuit.

Aug. 23, 1972.

Rehearing and Rehearing En Banc
Denied Nov. 13, 1972.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Elmer P. Davis, Director, Region 16, N. L. R. B., Fort Worth, Tex., Douglas S. McDowell, Atty., N. L. R. B., Washington, D. C., for petitioner.

Jacob Sheinkman, New York City, for Southwest Reg. Joint Bd., etc.

Edward F. Seligman, Herbert I. Meyer, New York City, for respondent.

Before AINSWORTH, GODBOLD and MORGAN, Circuit Judges.

GODBOLD, Circuit Judge.

We grant an enforcement order against the company for refusal to bargain.[1]

The most important issue is whether the company has shown sufficient reason for us to overturn the determination of the Regional Director that an appropriate bargaining unit is the company's plant at Waco, Texas.[2] The company contends that the evidence compelled a finding that the only appropriate unit was a multiplant unit which included its other three plants in other Texas cities. We attach as an appendix to this opinion findings of the Regional Director which set out the facts on this issue.

■ The Board's discretion in making unit determination is very broad, and our standard of review is narrow. NLRB v. Schill Steel Products, Inc., 340 F.2d 568 (5th Cir. 1965). The fact that a multiplant unit might also have been appropriate is not a basis for overturning the Board's determination. NLRB v. Fidelity Maintenance & Construction Co., 424 F.2d 707, 709 (5th Cir. 1970). The Board need choose only *an* appropriate unit, not *the most* appropriate unit. State Farm Mutual Auto. Ins. Co. v. NLRB, 411 F.2d 356 (7th Cir. 1969).

There are a multitude of factors which the Board and the courts have employed as indicia in cases where the issue has been single versus multi units, including: operational integration of the units; geographical proximity; authority of the local unit supervisor, especially with regard to matters that traditionally are the subject of collective bargaining, such as hiring, firing, discipline, rates of pay, hours of employment, and benefits; type of work done by the employees in the unit; numerical size of the units; uniformity of wages, hours, working conditions and benefits; contact between employees at one unit and those at other units; interchange of employees; centralization of labor relations and collective bargaining. One case will emphasize one or more factors, the next will place more importance upon other factors, and what is emphasized in one may be deemphasized or distinguished in another. Harmonizing the cases into a uniform pattern is not wholly feasible, because of the factual nature of the determination, the broad discretion in the agency in making one of several acceptable choices, and the limited scope of correctly applied judicial scrutiny.

■ In this instance we are not able to say that the Regional Director was required to designate a multiplant unit or that he abused his discretion in designating the Waco plant as the unit. The Waco plant is not merely a sewing line like the other three plants, although it includes a sewing operation with a manager therefor. As the Regional Director pointed out, Waco is also the company's principal office and place of business. Some of the operations located at Waco and not at the other plants are these: overall management; cutting of material; pressing and shipping assembled garments; central purchasing and warehousing of materials; technical service department for sewing machinery and equipment and techniques; central research and development department for new machinery and equipment; central maintenance for plants and sewing machinery; central fabrication of samples; central manufacture and repair of furniture and other wood equipment; central storage for machinery and equipment; central personnel department which maintains personnel files (with appropriate duplicate files at each plant), establishes hiring tests and termination standards; quality control; central training department for sewing machine operators; central industrial engineering department which classifies jobs and determines and schedules overtime. The character of these operations,

1. The Board's decision and order are reported at 188 NLRB No. 4.

2. The Board denied a request to review the Regional Director's decision.

serving all plants to some degree, tends to integrate the business. But at the same time the presence of these numerous operations and departments, located at Waco, tends to establish the character of the Waco plant as much more than another sewing line.

■ The Regional Director was entitled to give weight to the distance between the plants.[3] Other factors undergirding his conclusion are the effective participation by local plant managers in hiring and discharges, the small number of interplant transfers of employees, and the extent of organization so long as not controlling (no union had petitioned to represent the employees at all four plants).

The company places its strongest reliance upon NLRB v. Davis Cafeteria, 396 F.2d 18 (5th Cir. 1968), which rejected a Board-designated unit composed of two of eight cafeterias located in the vicinity of Miami, Florida. That case emphasized that the general office department of the company, located in Miami, determined labor policy, pay, hours and insurance benefits, while local managers had little authority over substantive subjects of collective bargaining. We agree with Continental Insurance Co. v. NLRB, 409 F.2d 727 (2d Cir. 1969), that Davis and its antecedents do not mean that centralizing final decisions on labor policies is alone a determinative factor and that Davis "showed an awareness of circumstances which would justify fractionating an employer's organization." Id. at 729. The present situation would more closely parallel Davis if the question were whether the plants at Temple, Hillsboro and Dublin were to be in one unit or fragmented into more than one. With each sewing line having the same general function, and labor policy primarily determined at a central office, plus the other factual

nexuses tending to show community of interest, the sewing operations at different sites resemble the separate cafeterias in Davis. But whether the combined sewing line and central office at Waco may be in a single unit or is required to be put into a unit with all the other geographically separated sewing lines is another question.

Banco Credito y Ahorro v. NLRB, 390 F.2d 110 (1st Cir. 1968), sustained as appropriate a single unit composed of one of 29 bank branches located at various places in Puerto Rico, although policies including labor matters were centrally determined. Compare NLRB v. Frisch's Big Boy Ill-Mar Inc., 356 F.2d 895 (7th Cir. 1966), which found inappropriate a unit composed of one of a chain of 10 restaurants located in Indianapolis, Ind. and having a separate general office. Also the parties agreed that an eleventh restaurant located 60 miles away in another city could constitute a separate unit.

The present case is similar to NLRB v. Schill Steel Products, Inc., supra, insofar as company structure is concerned. The employer maintained its central office and warehouse in Houston, Texas, and branch warehouses at Dallas and Odessa, Texas and Tulsa, Oklahoma. We upheld the Board's determination of a single unit at Houston against the company's contention that a company-wide unit was required.

Thus we conclude that designation of Waco as a single-plant unit was within the Board's discretion. The only other issue deserving comment is the claim of the company that over-the-road (as distinguished from interplant) truck drivers should have been included in the unit. Four of the ten over-the-road (OTR) drivers voted, and their ballots were challenged and have been sealed. The vote was 389 to 385 in favor of

3. See NLRB v. Frisch's Big Boy Ill–Mar Inc., 356 F.2d 895 (7th Cir. 1966), in which the court considered the appropriate unit to be a chain of 10 restaurants located in one city, but the parties agreed that an eleventh restaurant located 60 miles away in another city could constitute a correct unit. In NLRB v. Davis Cafeteria, Inc., 396 F.2d 18 (5th Cir. 1968). discussed below, all the cafeterias were in and around the city of Miami.

the union, so these four votes, if unsealed and against the union, could force another election.

■ In resolving the challenges the Regional Director found that the OTR drivers did not share sufficient community of interest to warrant their inclusion in the unit consisting of production and maintenance employees at the Waco plant. Interplant drivers were included in the unit. They operate from the Waco plant, delivering merchandise from there to the other three plants and returning with garments that have been sewed at those three. They are paid hourly, punch a time clock, and return to the Waco plant each night. Thus they are in day to day contact with employees at Waco. The OTR drivers, on the other hand, drive between the Waco plant and the various suppliers of the company. They are separately supervised. Their trucks are maintained at and dispatched from a truck stop in Waco, since there are no accommodations for them at the plant. Their only contact with employees in the bargaining unit at Waco is approximately once a week for clerical purposes. They are paid a salary with overtime and are on the road for days at a time. Under these factual determinations, supported by substantial evidence, the Regional Director's decision may not be overturned.

We agree with the Board that the OTR drivers were not stipulated to be members of the unit. The list of included employees included "truck drivers." A company official described this group of employees as follows:

> Truck Drivers. Truck drivers are used to move cut work, the component parts, from Waco to Hillsboro, to Dublin, and to Temple. They pick up assembled garments from the sewing floor in Waco, Hillsboro—not in Waco—but in Hillsboro, Temple and Dublin, and bring back to Waco and deliver to the Finishing Department.

The company relies upon a reference in the record to "truck drivers" where it is said: "Their inclusion was by an understanding of the parties at the hearing that they were production employees." But this reference is to "truck drivers" whose duties were described by the company official as quoted above. It tends to exclude the OTR drivers rather than to stipulate their inclusion.

The other points raised do not require discussion.

The company was not justified in refusing to bargain. Enforcement is granted.

## APPENDIX

\*    \*    \*    \*    \*    \*

The Employer (a wholly-owned subsidiary of Genesco) is a corporation engaged in the manufacturer of men's work clothing and sportswear in four plants located at Waco, Temple, Hillsboro and Dublin, Texas, with its principal office and place of business at Waco. The Waco plant with approximately 900 employees produces men's long- and short-sleeved shirts, men's work trousers, boys' dress-up jeans and, under a Government contract, navy dungarees. The Temple plant with approximately 300 employees produces men's casual slacks and, under a Government contract, combat trousers. The Dublin plant with approximately 170 employees produces boys' fancy dress-up jeans with patch pockets. The Hillsboro plant with approximately 130 employees produces men's work pants. From Waco the plants are located approximately 30 miles to Temple, 35 miles to Hillsboro, and 85 miles to Dublin.

There is much to be said on behalf of the position taken by the Employer to find a multiplant unit. In Waco there is an over-all manager and a director of manufacturing. Each of the other plants has a plant manager, while Waco has separate managers for the sewing lines, cutting, pressing, and shipping. The requirement for production in all four plants is determined centrally by the Employer's production planning committee, including plant schedules. All necessary material such as piece goods,

threads, zippers, buttons, so forth are centrally procured. Such items are warehoused in Waco and dispensed to the separate plants as needed. The central cutting department at Waco marks and cuts the material to be used and sees that it is properly ticketed and made ready for the sewing lines. The plants outside of Waco are supplied the cut parts by the Employer's trucks which operate between plants on a daily basis. After the cut parts have been sewn, they are returned to the Waco plant, where all of the sewn products are further processed, going first to the central pressing department where they are pressed and checked for defects. After this they are taken to the central shipping department where they are properly assorted and shipped to customers. Records of these various stages of production and operation are kept at Waco.

Many support services are furnished by the Waco plant to the other plants. A central technical service department is responsible for seeing that all plants have made available to them the latest sewing machinery and equipment and techniques. A central quality control department checks on daily reports on the quality of all products received from the plants to determine that standards are adhered to. A central research and development section builds new machinery and equipment for various sewing lines to improve efficiency. A central plant maintenance department is responsible for the maintenance of all facilities and equipment other than sewing machines in the plants. A central engineering section fabricates the samples for garments which are later sewn in one of the plants. Ninety percent of the samples are fabricated in the Waco plant, with the balance of the time being spent in the other three plants. A central woodwork maintenance section makes furniture and other wood equipment and repairs it for all plants. A central accident and safety control section establishes and maintains uniform safety standards in all plants. A central maintenance of sewing machines

has the responsibility for the maintenance of sewing machines at all four plants. A central machine storage department stores and maintains sewing machinery and equipment which has been taken out of production. Further details of these central operations are discussed below.

A central personnel department in Waco establishes personnel and industrial relations' policies which are uniform. It has a standard test required for hiring employees. It has standard termination procedures to be followed. It prepares and issues an employee handbook. Personnel records for all employees are maintained here. The central industrial engineering section also establishes standards of pay for employees on each job classification and production line for all plants. The central training department prepares a manual for training sewing machine operators which is the guideline in training new employees or retraining old operators upon the introduction of a new garment. Central industrial engineering department also establishes the number of employees to fill each job classification; and when necessary, overtime for all plants is determined centrally and scheduled.

The employees at all plants enjoy uniform job benefits. Holidays, vacations, group hospitalization, and group life insurance are the same. Seniority for holidays and vacation benefits is employerwide. A central credit association is operated for all plants from Waco. A stock purchase plan is available to all employees. Certain discounts on shoes manufactured by Genesco are available when purchased from certain stores in the area. Incentive standards are the same in all plants for the same work. Starting rates, hourly rates within the same job classification are uniform.

Thus, as we have seen from the point of sharing a community of interest, there is ample support for considering all four plants as a multiplant unit. However, other factors are not present which would compel finding a multiplant unit to be appropriate. No union is seeking to represent the employees in all

four plants, and there is no previous history of collective bargaining among the employees to support such a unit contention. As set forth below, we have found that there is an appropriate unit commensurate with the unit sought by the Petitioner in the Waco plant.

While it is not necessary in deciding that the Waco plant constitutes an appropriate unit to find that each of the three other plants separately constitute an appropriate unit, it is important to note that the three other plants do exercise self-autonomy on a day-to-day basis within the operational limits prescribed by the central authority. Thus, each plant has a separate manager, is geographically separated, and is therefore a distinct and readily identifiable group. The manager has authority to hire employees temporarily or on probation subject to final approval by the central authority. He has the right effectively to recommend discharge of employees. The withholding of approval of any such recommendations is a rarity. Workers are recruited locally through newspapers and radio. They make application to the local plant. Duplicate personnel records are kept at the local plant. Payrolls are prepared at the local plant. Temple issues its own pay checks on a local bank, while Hillsboro issues pay checks for both its employees and those of Dublin. Interplant seniority is limited to financial matters, such as holidays and vacations, and an actual transfer to another plant results in a loss of job seniority. Transfers between plants are at an absolute minimum and are effected as an accommodation to an employee. Each plant keeps its own quality control record by machine and major defects detected at the time of the inspection at Waco are returned to the plant where it was produced. Temple and Dublin each have two sewing machine mechanics, while Hillsboro has one. There are seven machine mechanics at Waco who do at times travel to the other plants to assist. Central plant maintenance department does send its employees to the plants outside of Waco to make necessary repairs and construction. The central woodwork maintenance section renders similar services, inasmuch as furniture and wood equipment is concerned. The greatest amount of time rendered by any of the central departments or sections to the three other plants appears to be that of central plant maintenance department, estimated at 30 percent of the time. This is not too significant when it is considered that this time is spread between three plants. Further, and more important, all people servicing the three other plants traveling from Waco punch in and out at Waco and are considered part of the Waco work force and do not become identified as part of the outside plants. The services centrally furnished both by supervisory and employee help, while important to the efficiency and overall production of all plants, have an insignificant impact on the identity and day-to-day autonomy of the outside plants. While the sewing operation is but one of several steps as outlined above in the production of the finished garment such integration under circumstances as present in this case is considered "a less significant factor" in the resolution of the importance to be attached to factors leading to a determination of an appropriate unit because of modern manufacturing techniques, improved communications and handling facilities, and the great need to take advantage of labor markets not readily available at the central location. Black & Decker Manufacturing Company, 147 NLRB 825. Some transfer of sewing work between the plants does not appear significant on this record.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.